NOTICE
Decision filed 07/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260222-U

NOS. 5-26-0222, 5-26-0223 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* JAMAL G. and ARMON G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 19-JA-134, 19-JA-135 |
| v. | ) | |
| | ) | |
| Atosha H., | ) | Honorable |
| | ) | Elaine L. LeChien, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices McHaney and Hackett concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's orders terminating Mother's parental rights were not against the manifest weight of the evidence where the State met its burden of proving that Mother was unfit to parent and that termination was in the best interest of the minors. Therefore, the circuit court's orders making a finding of unfitness and terminating parental rights are affirmed.

¶ 2     The respondent, Atosha H. (Mother), appeals the orders of the circuit court of St. Clair County terminating her parental rights to her two minor children. She argues that the circuit court's orders finding her unfit and terminating her parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On June 4, 2019, the State filed petitions alleging that the minors Jamal and Armon (twins, born June 2015) were neglected and abused.[1] Count I alleged that the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) due to abandonment, in that Mother had left both minors with a relative, who indicated that she could not care for multiple children with autism and that no other relative could care for the minors. The State further alleged that Mother had had been "stopped by Fairview Heights police at 1:00 a.m. on May 31, 2019 for walking on the streets with [both] minor[s]," that Mother had "mental health issues" and had been taken to Touchette Regional Hospital for a mental health assessment, that Mother and both minors had previously been living in a homeless shelter, that Mother was currently homeless, and that Mother had reported that she was not able to care for the minors once contacted after several failed attempts. Count II alleged that the minors were dependent pursuant to section 2-4(1)(b) of the Juvenile Court Act (*id.* § 2-4(1)(b)) for the same reasons, with the petition explicitly incorporating the allegations from count I.

¶ 5      Based on the record, it is unclear whether a shelter care hearing was held on June 4, 2019. Nonetheless, neither parent appeared for the hearing and the circuit court determined there was probable cause to believe the minors were neglected, abused, or dependent. The circuit court entered a temporary custody order the same day, appointing DCFS as the temporary custodian of the minors.

¶ 6      On May 16, 2022, adjudicatory orders were entered for both minors. It is unclear from the record whether a hearing was held, but neither parent appeared for the hearing and both were

---

[1]The father of the minors is not a party on appeal.

defaulted. Per that order, the minors were found to be neglected and dependent. On May 22, 2022, Mother filed a motion to vacate the default judgment, and it was granted on August 8, 2022. The written order granting the motion also included: "Mother must appear at all hearings or default may be entered."

¶ 7     A disposition report was filed on September 6, 2022, for both minors and a third sibling who is not part of this appeal. The report had a stated goal of returning the children home, noting that adjudication had not yet occurred. Another disposition report was filed on February 24, 2023, and a third was filed on March 22, 2023. The stated goals of the reports remained the same.

¶ 8     Mother failed to appear for court on April 3, 2023, and the order from that date indicates that she was defaulted with the matter being continued for "DISPO/PROVE-UP" on May 1, 2023. On May 1, 2023, Mother filed a motion to vacate the default judgment from April 3, 2023. Mother did not appear in court on May 1, 2023, and was instead represented by her attorney. Mother's motion was denied on that date, and an order was entered finding that the minors were neglected and that they should be made wards of the court, with guardianship placed with the Illinois Department of Children and Family Services.

¶ 9     On September 19, 2023, a permanency report was filed. Armon was noted as being autistic, and previously nonverbal, but the report noted he had begun communicating over the last year. Armon was placed with a relative and doing well. Jamal had previously been placed with Armon in the same relative placement, however, he had subsequently been placed in a traditional foster home as Jamal was also autistic and the relative had found it difficult caring for two autistic, and at the time, nonverbal, children. Jamal was noted to still be nonverbal, however he was doing well in his foster placement. With regard to Mother, the report stated she had moved to Kentucky, obtained a job, and provided a pay stub as proof of that employment. Mother had "not made regular

3

visits" with the minors since moving, however, and her last documented visit was October 3, 2022. Mother had asked to change the day of the week visitation occurred due to her work schedule and it was noted that the missed visits were due to living in Kentucky and her work schedule. Mother had completed a mental health assessment in 2020, although documentation of that assessment noted that Mother "was not very forthcoming with information and declined any of the recommendations that were made." The circuit court then held a permanency review on September 25, 2023. In the order from that review, the circuit court noted, "haven't hear from [Mother] since April 2023."

¶ 10     The State filed a motion seeking a finding of unfitness and termination of Mother's parental rights on December 22, 2023. The motion alleged that Mother was unfit in that she had abandoned the minors, pursuant to section 1(D)(a) of the Adoption Act (750 ILCS 50/1(D)(a) (West 2022)); failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, pursuant to section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)); and deserted the minors for more than three months preceding the commencement of Adoption proceedings, pursuant to section 1(D)(c) of the Adoption Act (*id.* § 1(D)(c)).

¶ 11     On February 28, 2024, another permanency report was filed. This report read the same as previous reports with regard to the minors, but with regard to Mother, it now noted that she had "not had any contact with the new worker" and that "it is now 2024 and there has been no word from [Mother] or about her services." The report reflected that Mother's last documented visit with the minors was still October 3, 2022. The circuit court held a permanency review on March 11, 2024. In the order from that review, the circuit court noted "No contact from M[other for] 1 y[ea]r" and "no recent visits."

4

¶ 12    On June 7, 2024, Mother appeared in court and was provided copies of the State's motions to terminate her parental rights as to both minors. She requested the appointment of an attorney and filled out a certified request for that purpose. In that document, she indicated she needed "shelter here in the St. Clair County area." She indicated that she was employed in Kentucky, but had a workman's comp case open and was not currently being paid. On that same date, she filed with the court a "Respondent Contact Information" sheet. In that document, she listed a phone number and email address. In listing her residence, she stated, "homeless and looking for shelter resources." She also wrote on the sheet, "I am and will not sign my rights over."

¶ 13    On August 23, 2024, a permanency report was filed with the court. The status of the minors remained the same, but with regard to Mother, the report stated:

> "On June 7th 2024 [Mother] did appear at court. [Mother] reported to the worker that she was back from Kentucky and would like visits with the kids and [to] start services. [Mother] reported that the reason she has not seen her kids or reached out to them in two years is because she was working and in school. [Mother] reports she is currently homeless. The worker gave her a list of resources for shelters. [Mother] reported her cell is off, the worker gave [Mother] her contact information. [Mother] did not contact the worker until August 16th 2024 asking for the next court date."

The circuit court held a permanency review hearing on September 9, 2024, where the written order further noted "Mother has not completed any services."

¶ 14    Another permanency report was filed on February 18, 2025. The contents of that report were largely the same as the previous report, with the last documented visit between Mother and the minors remaining October 3, 2022. The circuit court held a permanency review on March 10, 2025. On March 18, 2025, a copy of the family service plan was filed with the circuit court. The

5

family service plan indicated that Mother needed to find stable housing for herself and her children, maintain employment, get a second mental health assessment, participate in individual therapy, and visit weekly with the children while not displaying any negative behaviors. Unsatisfactory progress was noted for all Mother's goals.

¶ 15    The matter proceeded to a fitness hearing on August 5, 2025. Mother was present at the hearing with her attorney. The State called Jade Jones, a caseworker with Hoyleton Youth and Family Services (HYFS) assigned to Mother's case. Jones testified that she became the caseworker in approximately August 2023. When she became the caseworker, she was informed via the case notes, reports, and service plans in the file that Mother was residing in Kentucky and had not seen the minors since 2022. Mother had informed the agency that she had moved to Kentucky in order to obtain employment via an email exchange. The only contact information the agency had for Mother when Jones was assigned the case was a P.O. box, and Mother could not be contacted directly unless she reached out first.

¶ 16    Jones testified that once she was assigned to the case, she did not hear from Mother until the end of summer 2024. Prior to that, Mother had not reached out to the foster parents of either child asking about the children since her last visit with them, nor had she sent any money, gifts, or birthday cards to them during that time. Jones and other HYFS staff could only assume Mother was still in Kentucky and did not have an address for her whereabouts. With regard to Mother's service plan, Mother was to complete parenting education, obtain a mental health assessment and complete any recommendations, obtain a psychological evaluation, maintain housing and employment, and participate in visitation with the children. She obtained the mental health assessment, but did not follow through with recommended services, making her performance on

that part of the service plan unsatisfactory. She was otherwise rated as unsatisfactory by HYFS for all other services as well.

¶ 17 Jones testified that she had only met Mother about three or four times, when Mother was at the most recent court hearings prior to the fitness hearing. The first of those meetings took place at the end of summer 2024. During that meeting, Mother told Jones that she was homeless, was out of work, and had a pending worker's comp case. Mother indicated that she would be trying to come back and forth between Illinois and another state to see the children. The caseworker was unable to remember which state, but was able to positively assert it was not Kentucky. However, Mother was unable to provide availability for visits, so they were unable to be scheduled. Mother did not give Jones any money or items to give to the children when she came to court hearings. In June 2025, Mother claimed she reached out to Armon's foster parent, her half-sister, through Facebook, and video-chatted with him, although Jones did not know much about the interaction, as she had only learned about it from Mother that day. Jones knew of no other time that Mother had spoken to either child since 2022. During one of those meetings, Mother requested her service plan be sent to her, and some discussion was had about taking steps toward completing those services. Jones's last meeting with Mother was after court in May 2025. Other than her video chat with Armon in June, Mother had not reached out since that time attempting to visit with the children.

¶ 18 On cross-examination from Mother's counsel, Jones was shown a legal screening form with two dates on it, April 3, 2023, and April 4, 2023, which she agreed meant the form was probably prepared between those two dates. Jones agreed that the form indicated the frequency of contact between Mother and children was "sporadic," with it further indicating that:

7

"Mother will have supervised visits set up and be consistent for a month or so and then not have contact with the agency. She had not seen her children since October. She has reached out once in the past three months saying she would be present for her visit. The agency explained since she had not been to a visit in over six months she was taken off the list and would need to be added back on. [Mother] has not had any further contact with the agency as this time."

¶ 19 Upon questioning from the guardian *ad litem*, Jones clarified that Mother's most recent visit with the children was October 2022, with no visits occurring in 2023, 2024, or 2025. Mother's service plan was discussed with her once contact restarted after the June 2024 court date, with Jones going over the elements of the service plan with Mother. After the service plan was explained to Mother, no part of the plan was completed by Mother thereafter. The children had been in care for six years as of the hearing date.

¶ 20 Mother then testified on her own behalf. She testified that she obtained a mental health assessment from Chestnut Health Systems remotely by telephone, due to the ongoing COVID-19 pandemic, in August 2022. After that assessment, she testified that she had obtained mental health services through Dr. Loynd of the Southern Illinois Health Foundation. Dr. Loynd had been providing her with counseling and prescriptions since 2008 or 2009. Mother testified that she did not ever really consider herself to have "moved" to Kentucky, because while there she did not have a permanent address and was staying in an extended stay hotel with a male companion, although she did obtain a job in Florence, Kentucky, with Robert Bosch Automotive Steering starting in September 2022. Mother testified that there was "a break in the visitations from *** 2020 until 2022 when I started working. Yes, we had visits. They were stopped because of something that was going on with Hoyleton. I don't know. And then it started back after I started working with

8

Robert Bosch." Mother testified that at least one missed visit prior to her relocation to Kentucky was because of transportation issues, as the transportation picked her up at the Metrolink station rather than the permanent address she had in Belleville, Illinois, at the time. Mother stated that she "didn't even really start missing until I started working that winter." Mother also claimed that some of the problems with visitation was that Jamyra Conners, her contact with HYFS, began treating her "like I was a danger to her and that I was going to do something to her." According to Mother, this occurred after a phone conversation in June 2022 with Armon's foster parent, Mother's sister, where Mother told her sister that Conners needed to be "hit in her mouth" for stating that Mother sounded in emails and phone calls like she was "a mental ill, insane patient."

¶ 21    Mother indicated that she had stopped visits during the winter of 2022 to 2023 due to an ice storm where things had frozen during the period between Thanksgiving and Christmas, making it unsafe to travel. Mother claimed she attempted to restart visitation in the spring but when she called to arrange for it she was told, "no, I had missed too many they wasn't gonna start visitations back up." Prior to that, in 2022, she spoke to HYFS asking to change the visitation schedule to accommodate her work schedule. After visitation stopped in the winter of 2022 to 2023, Mother further claimed that she "couldn't do anything" because if she attempted to call the foster parents directly to arrange visitation, "they scream mental illness, call the police." She claimed she could not pursue visitation through the agency either, as if she were to "fuss a fuss," Conners would again call the police on her, as she had after the "hit in her mouth" comment. When asked directly what she had done between February 2023 and June 2024 to attempt to see her children, Mother answered, "nothing." Mother admitted no visits occurred during the entirety of 2023.

¶ 22    Mother stated that when she came to court in June 2024, she asked about restarting visitation. She stated that the agency did "nothing" to facilitate visits after this request. Mother

9

claimed to have tried calling the agency, but that her calls always went to voicemail and she never received any return calls. Mother said she had made about five such calls within the last two months prior to the hearing. Mother testified that the only time she ever received a copy of her service plan was when the case initially opened in 2019. She stated that the plan required her to obtain housing.

¶ 23    When asked about the allegation that she had failed to maintain a reasonable degree of interest, concern, or responsibility for her children, Mother responded that she could obtain work and take care of her children. She appeared to cast blame on the agency for "not want[ing] to assist me into getting a stable housing." Specifically, Mother claimed that at one point she was about to obtain an apartment through the East St. Louis Housing Authority but was denied and taken off the list when Conners failed to confirm her open case with children in foster care. Mother stated, "I feel like I am a perfect mom. *** Caring. I never abused them, They had everything that they needed. *** Due to enemy, they say what they say and they are what, rumors, rumors, rumors, you know, but my children were taken care of."

¶ 24    The parties presented no further witnesses or evidence, and the circuit court recessed. Prior to arguments being heard, on September 10, 2025 another permanency report was filed, with its contents being largely duplicative of the prior report. Arguments were heard on September 24, 2025. The State argued that Mother had abandoned the children as there had been no visits since 2022. The State also took issue with Mother having gone to Kentucky, "away from her kids, away from any of the responsibility that goes with it," when she could have obtained employment nearby. The State noted that Mother sent no presents, cards, clothing, or any other items to the children, and, instead, "wiped her hands clean of the situation." It also noted that once Mother returned to the state, she did not follow through with getting the agency a schedule so visits could

10

resume. The State argued, "Simply asking about your kids, simply asking if you can visit your kids, simply expecting the system to work around your schedule is not interest or concern."

¶ 25   The State noted that the only part of her service plan that Mother had arguably completed at any time was obtaining employment, and that she otherwise "never followed through with just about anything in this case." The State also argued that Mother took no responsibility for her children being in and remaining in care, blaming the agency or situation generally. Finally, the State argued that the three months of desertion occurred in 2023, prior to the State filing its petition on December 22, 2023.

¶ 26   Mother's attorney argued that the children had not been abandoned, as that required a "purpose to intentionally forgo all parental duties and to relinquish all parental claims to the children," which Mother had not done and the State had not shown. Mother's attorney made a similar argument for desertion, claiming "an intention to permanently terminate custody over the children" must be shown and had not been, because Mother asked to see her children but had been told she was taken off the list prior to visits stopping entirely. With regard to the allegation that Mother had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, her attorney argued that Mother had faced "challenges" but that the HYFS had done nothing to "work[ ] with her in trying to accommodate her schedule." Her attorney argued that while in Illinois, visits were regular, but that once she moved to Kentucky where "the employment situation was better," she had trouble with her work schedule and travel that interfered with visitation, but that she "asked throughout that period of time to see her kids." Her attorney argued that this showed maintained interest.

¶ 27   With regard to completion of the service plan, Mother's attorney argued there was no evidence that anyone had ever adequately explained to Mother what was expected of her, or that

11

she had ever received a copy of the service plan prior to 2024. He also argued that she had completed a mental health assessment as required.

¶ 28   The circuit court took the matter under advisement. Another two permanency reports were filed prior to the circuit court issuing its ruling. Again, their contents were largely duplicative of the prior reports. On January 5, 2026, the circuit court issued a written order finding that the State had proven by clear and convincing evidence that Mother was an unfit parent as to each ground alleged by the State. The court found specifically that:

> "Mother did not provide gifts, money, gift cards, or clothing for the minors. She provided no assistance for the minor's care or needs. Mother's last visit with the children was in October 2022.
>
> From August 2023 through December 2023, there was no contact between mother and case worker. Mother did not visit with the children during this period.
>
> In August 2024 and more recently, the case worker met with mother at the courthouse when the case was set for hearing. Mother indicated to caseworker that she wanted to visit the children but never followed up to schedule the visits or requested a visit on short notice and it could not be arranged.
>
> Mother did not visit with the children in the years 2023, 2024 and 2025."

¶ 29   On January 14, 2026, prior to the best interest hearing, Mother's attorney asked for leave to withdraw from his representation of her, citing a complete breakdown of the attorney-client relationship. In his motion, Mother's attorney claimed that breakdown arose from Mother having accused counsel of "lying under oath" and "perpetrating a scam." That motion was granted on February 3, 2026. At the time of counsel's withdrawal, Mother indicated she wished to hire

counsel, and was admonished that she had 21 days to obtain a new attorney. Mother was given notice of the upcoming March 2, 2026, best interest hearing date at that time.

¶ 30    The matter proceeded to a best interest hearing on March 2, 2026. Mother was not present for the hearing, nor was an attorney present on her behalf. The State called caseworker Jones from HYFS to testify. She testified that both minors were placed in licensed homes and that due to both having special needs, HYFS staff went out to check on them at their placements three times a month. Both minors had all of their needs met at their respective placements, and Jones had observed no problems at either placement. Jones testified that the two twins were placed separately, as the original placement, an aunt, had found caring for both overwhelming and thus one minor had been moved to another placement. Jones testified that Mother was due to have her first visit with the minors in three years on March 9, 2026. No father had ever come forward for the minors. Mother also had recently told Jones that she was engaging in parenting classes, per her service plan. Jones testified that she believed it was in the best interest of the minors to terminate Mother's rights, as she had no relationship with them and was missing for three years. During those three years, Jones stated Mother did not contact the children, provide anything for them, ask questions about the children, or contact her caseworker. Jones testified that the minors appeared, based on behavior, to view their foster parents as their parents and that both homes were adoptive placements for the minors.

¶ 31    The circuit court stated that it considered the admissible evidence and best interest factors as delineated in the applicable statute to determine the best interest of the minors. It found that both minors were in adoptive placements, were doing well in those placements, and that Mother had not visited with the minors in three years, nor had she done any services. The circuit court

13

found that the State had proven by a preponderance of the evidence that it was in the best interest of the minors to terminate Mother's rights.

¶ 32    The circuit court entered written orders for both minors on March 2, 2026, terminating Mother's parental rights to the minors. Mother timely appealed.

¶ 33                                II. ANALYSIS

¶ 34    On appeal, Mother argues that the circuit court's findings that she was an unfit parent and that the termination of her parental rights was in the best interests of the minors were against the manifest weight of the evidence. For the following reasons, we reject both contentions.

¶ 35                                A. Unfitness

¶ 36    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d 347, 352 (2004).

¶ 37    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.*

14

A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d at 354. In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 218 (2002).

¶ 38    In this case, the State alleged three grounds for unfitness: abandonment of the minors, pursuant to section 1(D)(a) of the Adoption Act (750 ILCS 50/1(D)(a) (West 2022)); failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, pursuant to section 1(D)(b) of the Adoption Act (*id.* § 1(D)(b)); and desertion of the minors for more than three months preceding the commencement of adoption proceedings, pursuant to section 1(D)(c) of the Adoption Act (*id.* § 1(D)(c)). Because a parent may be found unfit if the State proves any one of the statutory grounds by clear and convincing evidence, we may affirm the circuit court's decision if the evidence supports its finding as to any one of these grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64. For this reason, we need only consider whether the circuit court made sufficient factual findings to support its determination that Mother failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare. Since the language of the statute is in the disjunctive, any one of the three individual elements, *i.e.*, interest

15

*or* concern *or* responsibility, may be considered by itself as a basis for unfitness. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31; 750 ILCS 50/1(D)(b) (West 2022).

¶ 39    In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *Id.* at 1065. The court must focus on the parent's efforts, not his or her success. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *Id.* at 278. We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Subsection (D)(b) has no time constraint that limits our consideration of the parent's fitness. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Both noncompliance with a service plan and infrequent or irregular visitation with the child have been held to be sufficient evidence warranting a finding of unfitness under this subsection. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 40    Here, the finding that Mother failed to maintain a reasonable degree of interest was not against the manifest weight of the evidence, where she had not seen the minors for nearly three years by the time of the fitness hearing. While it is true, as Mother argues, that she showed some degree of interest by intermittently asking for visitation, this degree of interest was clearly unreasonable where her failure to follow up or actively pursue visitation meant that there was a years-long gap in visitation. While we do take into account Mother's circumstances, in that there

16

was a substantial period of time when she was out of state attempting to maintain employment, we also note that during that same period there was no contact whatsoever with the minors, in the form of cards, gifts, or any other token of care. The record in this case shows that from October 3, 2022, to the date of the fitness hearing, August 5, 2025, Mother was a nonentity in the lives of Jamal and Armon. Further, Mother failed to complete services. While she did obtain a mental health evaluation, she indicated no interest in recommended follow-up services, nor completed any. She acquired employment, but her housing was still temporary and unsuitable for children. There was no attempt, based on this record, to complete parenting classes until after the fitness hearing. Mother's infrequent visitation and contact with the minors alone is enough to show a lack of a reasonable degree of interest. Her further failure to complete services makes that conclusion overwhelming.

¶ 41 Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. Accordingly, we conclude that the circuit court's finding that Mother was unfit was not against the manifest weight of the evidence. Because we may affirm the circuit court's finding of unfitness on this ground alone, we need not address Mother's remaining arguments concerning the other statutory grounds for her unfitness. See *In re Gwynne P.*, 215 Ill. 2d at 363.

¶ 42                                      B. Best Interests

¶ 43 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home

17

life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 44 In making a best interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

" '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

705 ILCS 405/1-3(4.05) (West 2022).

¶ 45 As with the circuit court's findings at the unfitness stage, we afford the circuit court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 46 Mother argues on appeal that the circuit court erred in finding it was in the minors' best interest to terminate her parental rights. Mother argues that there was no evidence presented at the best interest hearing to support the circuit court's findings, but only the conclusory testimony of Jones. Mother also argues that there was no testimony as to some of the factors at all.

18

¶ 47 The circuit court's best interest determination was supported by the record and was not against the manifest weight of the evidence. The minors had two different placements. Both placements were capable of taking care of all of the minors' needs, and both provided permanency for the minors, with both placements having endured for nearly the entire pendency of the case and both looking to adopt the minors. Both minors appeared to view their foster parents as their parents and neither had a relationship with Mother, as she had not seen them in over three years. All of these facts show that the minors' sense of security, familiarity, continuity of affection, the least disruptive placement, feeling valued and loved, familial ties, and the need for permanency, stability, and continuity of relationships weighed in favor of the termination of Mother's rights.

¶ 48 We find that the State proved by a preponderance of the evidence that termination of Mother's parental rights was in the minors' best interests. The opposite conclusion is not clearly evident. As such, the circuit court's termination of Mother's rights was not against the manifest weight of the evidence.

¶ 49 III. CONCLUSION

¶ 50 For the foregoing reasons, the circuit court's orders of unfitness and termination of Mother's parental rights are affirmed.

¶ 51 Affirmed.